Taylor v Chiu (2025 NY Slip Op 51221(U))

[*1]

Taylor v Chiu

2025 NY Slip Op 51221(U)

Decided on August 1, 2025

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 1, 2025
Supreme Court, Kings County

Adam Taylor 
 and Christa Taylor, Plaintiffs,

against
Ernest S. Chiu, M.D., Eddie Louie, M.D., NYU Langone Medical Center, 
 Lily Clark, M.D., Anthony Antonacci, M.D., Ryan Suplee, M.D., and Lenox Hill Hospital, Defendants.

Index No. 509125/2018

Plaintiffs
Guy Regev, Esq. ([email protected])
Zucker & Regev, P.C.
186 Joralemon St, Ste 1010
Brooklyn, NY 11201-4326
347-524-5777
Defendants Ernest S. Chiu, M.D., Eddie Louie, M.D., and NYU Langone Medical Center
John William Barker, Esq. ([email protected])
Barker Patterson Nichols, LLP
300 Garden City Plaza, Suite 100
Garden City, NY 11530
516-282-3355
Defendant Lily Clark, M.D.
John E. Barous, Esq. ([email protected])
Schiavetti & Corgan
575 8th Ave Fl Rm 1220
New York, NY 10018
212-541-9100
Defendants Anthony Antonacci, M.D., Ryan Suplee, M.D., and Lenox Hill Hospital
Daniel P. Borbert, Esq. ([email protected])
Martin Clearwater & Bell LLP
220 E 42nd St, Fl 13
New York, NY 10017-5806
212-697-3122

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF No.s:
Seq. 4: 85 — 110
Seq. 5: 111 — 156, 199 — 202, 203 — 204
Seq. 6: 157 — 183, 199 — 202, 205
Defendant Lily Clark, M.D. ("Dr. Clark") moves (Seq. No. 4) for an Order, pursuant to CPLR 3212, granting summary judgment and dismissing Plaintiffs' complaint against her in its entirety.
Plaintiffs do not oppose the motion seeking summary judgment for Dr. Clark. Accordingly, the motion seeking summary judgment on her behalf is granted without opposition.
Defendants Ernest S. Chiu, M.D. ("Dr. Chiu"), Eddie Louie, M.D. ("Dr. Louie"), and NYU Langone Medical Center ("NYU Langone") move (Seq. No. 5) for an Order, pursuant to CPLR 3212, granting summary judgment on the basis that Plaintiffs' claims are time-barred by the statute of limitations, or in the alternative, granting summary judgment to Dr. Chiu and Dr. Louie on Plaintiffs' claims of medical malpractice, informed consent, and res ipsa loquitur, and granting summary judgment to NYU Langone as to Plaintiffs' claims of vicarious liability and negligent hiring/retention/supervision.
Plaintiffs oppose this motion only as to the claims against Dr. Chiu and NYU Langone. Plaintiffs do not oppose the part of the motion seeking summary judgment in favor of Dr. Louie, and they do not address any claims against Dr. Louie in their opposition papers, nor the issue of vicarious liability of NYU Langone on behalf of Dr. Louie. Accordingly, the branches of the motion seeking summary judgment on Dr. Louie's behalf, and dismissal of any vicarious liability claims against NYU Langone on behalf of Dr. Louie, are granted without opposition.
Defendants Anthony Antonacci, M.D. ("Dr. Antonacci"), Ryan Suplee, M.D. ("Dr. Suplee"), and Lenox Hill Hospital ("Lenox Hill") separately move (Seq. No. 6) for an Order pursuant to CPLR 3212, granting summary judgment and dismissing Plaintiffs' claims against Dr. Antonacci and Dr. Suplee for medical malpractice and lack of informed consent, and dismissing Plaintiffs' claims against Lenox Hill Hospital for vicarious liability and negligent hiring/retention/supervision. Plaintiffs oppose the motion of Dr. Antonacci, Dr. Suplee, and Lenox Hill Hospital.
Plaintiffs Adam Taylor ("Mr. Taylor" or "the patient") and Christa Taylor commenced this action on May 3, 2018, asserting claims of medical malpractice in connection with treatment rendered from approximately September 5, 2014, through March 19, 2015. Mr. Taylor's wife also asserts derivative claims for loss of companionship, society, and consortium.
At the time of the events at issue, Mr. Taylor was 34 years old and had a significant medical history, including Hirschsprung's Disease diagnosed at birth, for which he underwent a colectomy, linear scleroderma diagnosed at age 11 or 12, resulting in inflammation and thickening of the skin, and scar tissue and tissue depression affecting his hands, feet, neck, genitals, thighs, and buttocks. Mr. Taylor underwent various procedures, including a penile skin graft and split thickness skin grafts to both feet.
In May 2014, Plaintiffs moved from California to New York and Mr. Taylor began seeing dermatologist Dr. Clark to monitor his skin conditions caused by scleroderma. On August 13, 2014, Mr. Taylor revealed a chronic ulcer on his right leg, above his ankle, that had been present for more than two years and had not healed despite two rounds of skin grafts and debridement in California. He also had a wound on his left leg that appeared infected. Dr. Clark took a culture of the right leg wound and prescribed Augmentin. On August 18, 2014, Dr. Clark stated that she could not treat his wound and referred Mr. Taylor to a rheumatologist and to NYU Kimmel Wound Center for wound treatment.
On September 5, 2014, Mr. Taylor was evaluated by non-party Dr. Ross at NYU Langone for non-healing ulcers of the right lower extremity. Dr. Ross diagnosed the patient with linear [*2]scleroderma and ulcers to his feet and ankles and recommended plastic surgical consultation for an excision and flap. On September 12, 2014, Dr. Clark advised that the culture of the right anterior shin grew pseudomonas aeruginosa and confirmed that the patient would see a plastic surgeon at the NYU Wound Center.
On September 17, 2014, Mr. Taylor presented to Dr. Chiu, the Medical Director of the NYU Wound Center, complaining of ulcers present for three years. Dr. Chiu is a board-certified plastic and reconstructive surgeon who specializes in wound and scar repair. Dr. Chiu had over fifteen (15) years of experience in plastic surgery, specifically in reconstructive surgery, complex wounds, cancer reconstruction, and trauma, at the time of the matter at issue. (Exhibit "M" at 13-17.) Dr. Chiu noted a 3 cm, raised, and boggy wound on the right lower extremity with surrounding scar tissue and redness. Dr. Chiu conducted an MRI on September 28, 2014, that revealed tubular, mostly filled subcutaneous mass in the distal tibia.
Mr. Taylor was admitted to NYU Langone on October 18, 2014, where Dr. Louie performed an infectious disease consultation. Dr. Louie noted the fluid collection seen on the prior MRI was likely an abscess and recommended continuing antibiotics and proceeding to surgery. Later that day, Dr. Chiu performed an incision and drainage, sharp excisional debridement, and washout of the right lower extremity, sending wound cultures and a skin biopsy to pathology. The pathology report, dated October 23, 2014, noted "atypical squamous proliferation associated with an ulcer and dermal fibrosis . . . Note: a well-differentiated squamous cell carcinoma including a Keratoacanthoma cannot be completely excluded in this specimen. A close clinical follow with re-excision if any residual lesion remains or recurs clinically is recommended."
On October 29, 2014, Dr. Chiu emailed the patient stating he "released [the] path report thru MyChart." As indicated in the MyChart activity log "Record Viewer" tab, Mr. Taylor accessed and viewed this report on October 29, 2014, and November 5, 2014 (Exhibit "FF" at 1-2).
On November 12, 2014, a culture from the patient's right lower leg wound resulted in actinomyces meyeri and streptococcus. Dr. Chiu also saw and examined Mr. Taylor on this date. At this appointment, the patient's wound was "much less swollen than previous exam." Dr. Chiu recommended continuing antibiotics and elevating the lower extremity while at rest. Dr. Chiu also ordered an MRI of the right lower extremity to evaluate for underlying bone infection and referred the patient to a dermatologist. Mr. Taylor was instructed to return to visit Dr. Chiu in one or two weeks.
When Mr. Taylor saw Dr. Chiu again on November 26, 2014, the physician noted in his medical records that the patient had developed a new abscess, and his right leg had several open wounds that were granular and clean. Dr. Chiu discussed surgical wound debridement as a potential treatment option, as his wound had failed to heal, but Mr. Taylor elected to schedule the procedure for January 2015. The medical reports from this date indicate that the leg wound was attributed to the patient's linear scleroderma condition (Exhibit "S" at 24).
On December 11, 2014, Dr. Louie recommended a prolonged course of penicillin (6-12 months) due to the actinomyces meyeri and further debridement. About a week later, on December 17, 2014, Mr. Taylor returned to Dr. Chiu. The medical records from this appointment explicitly state that there is "no infection" (Exhibit "S" at 32). Dr. Chiu outlined a plan to continue local wound care and discussed with the patient a potential surgical debridement on the patient's right leg in January, if the wounds did not continue to heal.
On January 21, 2015, Mr. Taylor returned to Dr. Louie, who noted that one of the patient's surgical incisions completely healed and his second surgical incision continued to heal and required packing (Exhibit "U" at 2). Dr. Louie noted the patient was in stable condition from an infectious disease standpoint and that the patient should remain on Augmentin, an antibiotic (Exhibit "U" at 5). Dr. Louie instructed the patient to continue local care and Augmentin and again stated the patient would require a further debridement of the "lateral collection/mass per Dr. Chiu" (Exhibit "U" at 5).
Mr. Taylor's next and last appointment with Dr. Chiu took place on March 19, 2015. Dr. Chiu noted a left anterior tibial mass drainage, the patient's wounds had healed, and there was no cellulitis. Dr. Chiu discussed abscess drainage with Mr. Taylor and ordered the continuation of local wound care.
Dr. Chiu initiated contact with Mr. Taylor for the last time on July 7, 2015. Mr. Taylor replied on December 4, 2015, stating that he was seeing a different physician due to insurance changes.
In the summer of 2015, Mr. Taylor developed a reddish lesion on his left hand and returned to see dermatologist Dr. Clark, who diagnosed it as a wart (Exhibit "R" at 8).
On January 7, 2016, Mr. Taylor began treating with Dr. Anthony Antonacci for a chronic right leg wound that had persisted for four years. Dr. Antonacci is a board-certified general surgeon and had over thirty (30) years of experience in general surgery at the time of the matter at issue (Exhibit "P" at 9-17). During this time, he was chief medical officer at Lenox Hill Heart and Vascular Institute of New York. The medical records from this appointment noted the MRI the patient had undergone one year earlier, which was negative for osteomyelitis, and the prior NYU biopsy that was suspicious for squamous carcinoma (Exhibit "Q" at 25). It was also noted that the patient had not followed up for the wound.
At this appointment, Dr. Antonacci conducted a vascular and wound examination, which demonstrated a lobulated, irregular wound with heaped up areas of inflammatory tissue, measuring about 10 x 11 cm, and appeared to have the potential for malignancy (Exhibit "Q" at 25). Dr. Antonacci ordered very aggressive topical antibiotics and detailed wound care: the patient was to clean his wound twice a day with Hibiclens, an antimicrobial antiseptic skin cleanser, gently scrub the wound with a soft sterile sponge or cloth, and rinse it with saline (Exhibit "W" at 23-24). Dr. Antonacci also ordered dressing changes in the mornings with a 4 x 4 moist gauze, Neomycin, an antibiotic, Lidex cream, a topical steroid used to treat itchy skin conditions, and Xeroform, a gauze dressing, and dressing changes in the afternoons with Amphotericin, an anti-fungal medication. Dr. Antonacci also planned for further imaging to rule out osteomyelitis, a wound culture, possible surgical excision for pathology, debridement with placement of allograft if negative for osteomyelitis and a vitamin regime, consisting of Centrum with Minerals, B complex, and Vitamin C (Exhibit "W" at 24; see also Exhibit "K" at 29; Exhibit "Q" at 25-26). At this time, Mr. Taylor made no complaints to Dr. Antonacci regarding his chest, neck, or hands (see Exhibit "Q").
A week later, on January 15, 2016, Mr. Taylor presented to non-party dermatologist Dr. Horatio Wildman ("Dr. Wildman") at New York Presbyterian Hospital with a chief complaint of "moles" and "ulcer." The medical records from this appointment noted a history of morphea [FN1]
and intermittent sores on feet and hands. (Exhibit "W" at 7). The medical records also noted that the right lower leg wound was complicated by infection and abscess formation, which required draining. The records noted a history of actinomyces, along with the recommendation for long term penicillin. Mr. Taylor reported taking a "holistic approach" for the past year without improvement. (I.d.). Upon exam, the right lower leg had a "large ulcer with boggy border and multiple pustules and draining sinuses" (i.d. at 8). Dr. Wildman performed a punch biopsy to the right lower leg and a shave biopsy to the wart on the patient's left hand (i.d.).
The following week, on January 21, 2016, Mr. Taylor returned to Dr. Antonacci for a follow-up appointment. The medical records from this appointment noted that the right ankle wound was improved with decreased drainage but still looked chronically inflamed. (Exhibit "Q" at 24). The results of the culture demonstrated Peudomonas aeruginosa, Morganella morganii, and rare Staphylococcus aureus. (see Exhibit "P" at 134). The medical records documented that Mr. Taylor had seen dermatologist Dr. Wildman and that two biopsies had been performed [*3](Exhibit "Q" at 24). Dr. Antonacci's plan was to obtain an MRI and a Gallium CT scan to evaluate the bone and underlying soft tissue involvement with the anterior and posterior tendon sheaths (i.d.). If the bone was involved, IV antibiotics would be required. If the bone was not involved, but the tendon sheaths were involved, then muscle flap might be needed. Otherwise, a tangential excision may be done with immediate coverage with homograft. (I.d.)
On January 28, 2016, a Gallium CT of the ankles and feet was done at Lenox Hill to rule out osteomyelitis (see Exhibit "P" at 130). Imaging demonstrated increased gallium activity [FN2]
deep to the chronic wound on the medial aspect of the ankle. However, the gallium activity did not appear to be in the bone and there was no corresponding soft tissue abnormality (i.d. at 32).
Following Dr. Antonacci's orders, Mr. Taylor returned to Lenox Hill on February 9, 2015, for a whole-body bone scan. Imaging demonstrated increased uptake along the lateral and medial malleoli with non-specific but benign-appearing periosteal reaction at the distal third of the tibia. In conjunction with the scan from January 28, 2016, the findings were "likely secondary to chronic underlying soft-tissue inflammation, infection, or venous stasis, and not likely due to osteomyelitis." (i.d. at 128).
On February 11, 2016, Mr. Taylor returned to see Dr. Antonacci (see Exhibit "Q" at 23). The right lower leg wound had improved with decreased drainage. Dr. Antonacci noted that the bone scans did not implicate bone and soft tissue involvement, and did not appear to involve the tendon sheaths. (I.d.)
At this appointment, Dr. Antonacci brought in vascular surgeon Dr. Suplee to plan a "careful extensive tangential excision of the wound" with immediate coverage with homograft (see Exhibit "Q" at 34). The first surgery would be a diagnostic procedure to determine whether cancer was present in the wound (see Exhibit "K" at 57). After the inflammatory process was brought "under control," the wound could be excised and biopsies performed to prove that the wound was malignant (see Exhibit "K" at 36; see also Exhibit "L" at 19).
Prior to the wound debridement and placement of a homograft, the Lenox Hill records show that the risks, benefits, and alternatives of the procedure were discussed with the patient, and a consent form was signed (see Exhibit "P" at 102, 105). At the time of surgery, the wound had decreased in size to 6 x 4 cm (i.d. at 106). On February 19, 2016, Mr. Taylor underwent a right medial malleolar wound debridement and placement of a homograft performed by Dr. Suplee at Lenox Hill, with the presence of Dr. Antonacci. This procedure was performed to rule out malignancy (i.d. at 105). The pathology report, dated February 23, 2016, noted well differentiated squamous cell carcinoma (i.d. at 108).
Following the tangential excision, Mr. Taylor returned to Dr. Antonacci on February 25, 2016. At this appointment, Dr. Antonacci discussed the pathology results demonstrating well differentiated squamous cell carcinoma with the patient. An examination conducted by Dr. Antonacci demonstrated large areas of irregular and hypertrophic granulation with one area of necrosis. Dr. Antonacci's medical records noted that a re-excision to deeper levels was required. Dr Antonacci discussed the re-excision procedure with Dr. Suplee, who agreed to perform the surgery the following Monday. (See Exhibit "Q" at 8.) The purpose of the second excision was to remove the "bulky disease" with a negative margin and evaluate the area for the presence of a tumor (Exhibit "K" at 30, 44). Prior to the second debridement, the Lenox Hill records indicate that Dr. Suplee discussed the risks, benefits, and alternatives of the procedure with the patient, and a consent form was signed (Exhibit "P" at 39, 42).
On February 29, 2016, Mr. Taylor underwent a right leg re-debridement to obtain negative margins for cancer performed by Dr. Suplee at Lenox Hill, with the presence of Dr. Antonacci (see Exhibit "P" at 42-43). The surgical indication was a history of morphea and a [*4]chronic nonhealing right medial malleolar wound which was positive for malignancy following an excision and debridement (see Exhibit "P" at 42-43). The pathology report from this appointment demonstrated well differentiated squamous cell carcinoma extending into the right leg wound deep margin (see Exhibit "P" at 44). The excision specimen contained well differentiated cell carcinoma in about twenty percent of the tissue (see Exhibit "P" at 44).
Mr. Taylor presented to Dr. Antonacci and Dr. Suplee on March 3, 2016, for a postoperative follow-up and antibiotic dressing change (see Exhibit "Q" at 7). At this appointment, the patient's right lower leg wound was cultured. On March 10, 2016, Mr. Taylor returned to see both Dr. Antonacci and Dr. Suplee (i.d. at 3-4). The latest culture was negative for growth (i.d.). Dr. Antonacci and Dr. Suplee discussed the pathology results from the February 29, 2016, procedure with the patient, which demonstrated well differentiated squamous cell carcinoma with positive deep margins (i.d.). The patient stopped taking antibiotics and was referred to non-party general surgeon Dr. Robert Andrews for a surgical consult for additional management of the wound. The patient was also referred to oncology, plastic surgery, and radiation oncology for consults (i.d. at 40). Dr. Antonacci testified that at this stage, the patient's options were a wide excision, below-the-knee amputation, or above the knee amputation (see Exhibit "K" at 46). After this appointment, Mr. Taylor did not return to see Dr. Antonacci or Dr. Suplee (see Exhibit "K" at 93; Exhibit "L" at 38).
On May 13, 2016, the patient underwent a right below-the-knee amputation at Memorial Sloan Kettering Cancer Center due to cancer and infection.
On August 12, 2016, biopsies of Mr. Taylor's left hand and upper chest, ordered by nonparty board-certified orthopedic surgeon Dr. Daniel E. Prince, were positive for poorly differentiated invasive acantholytic squamous cell carcinoma (Exhibit "CC" at 462).
The patient visited Louis W. Catalano, M.D. ("Dr. Catalano"), a nonparty hand surgeon, on August 29, 2016, who assessed Mr. Taylor's lesion on his left hand. At that time, based on Dr. Catalano's medical records, the lesion was roughly half an inch and left the skin around it discolored. Dr. Catalano's medical records note that the left thumb squamous cell cancer was from the patient's chronic linear scleroderma (Exhibit "Z" at 2). Dr. Catalano ordered an x-ray and MRI of the left thumb, and he recommended and later performed Mohs surgery on that area.
On February 4, 2020, the patient underwent a left below-the-knee amputation at St. Mary & Elizabeth Hospital in Louisville, Kentucky, with the preoperative diagnosis including chronic left foot infection and severe systemic scleroderma.
The patient alleges that the treatment he received from the defendants, their agents, servants, and employees was rendered in a negligent and improper manner in failing to diagnose and treat the cancerous condition of his right lower leg. The patient further alleges that Defendants' departures from the standard of care proximately caused his injuries, including the below-the-knee amputation of his right leg, persisting physical pain, and continued mental anguish.
I. Dr. Chiu
A. Statute of Limitations
As an initial matter, Defendant Dr. Chiu seeks to dismiss the action on the ground that it is barred by the applicable statute of limitations. A defendant who seeks dismissal of a complaint on the ground that the action is barred by the statute of limitations must initially establish prima facie that the time in which to commence an action has expired (see CPLR 214-a; Ciancarelli v Timmins, 226 AD3d 643 [2d Dept 2024]). The burden then shifts to the plaintiff to raise a triable issue of fact as to whether an exception to the limitations period is applicable, the statute of limitations has been tolled, or the plaintiff actually commenced the action within the applicable limitations period (Ciancarelli v Timmins, 226 AD3d 643 [2d Dept 2024]).
Pursuant to CPLR 214-a, a medical malpractice action ordinarily must be commenced within two years and six months from the accrual. The statute of limitations begins to run on the date of the alleged wrongful act or omission or the date last treatment when there is continuous treatment for the same condition that gives rise to the act or omission (see CPLR 214-a).
For a medical malpractice action arising from an alleged failure to diagnose cancer or malignant tumor, the Court must also consider the effect of the 2018 amendment to CPLR 214-a, also known as "Lavern's Law." Under this amendment, the statute of limitations for such actions begins to run from the date the plaintiff "knows or reasonably should have known" that the negligent act or omission caused injury (e.g., when the undiagnosed cancer or tumor was discovered), or from the last date of continuous treatment, whichever is later.
Here, the defendant argues that the omission complained of occurred on March 19, 2015, when the patient had his last date of treatment with Dr. Chiu. Plaintiffs had to commence this action on or before September 18, 2017 (see CPLR 214-a). The date of filing of the summons and verified complaint establishes that the instant action was commenced on May 3, 2018, which was well beyond the two-year-and-six-month statute of limitations applicable to medical malpractice actions (i.d.).
In applying the continuous treatment doctrine alone, Plaintiffs' claim would be time-barred. "Under the continuous treatment doctrine, the limitations period does not begin to run until the end of the course of treatment if three conditions are met: (1) the patient continued to seek, and in fact obtained, an actual course of treatment from the defendant physician during the relevant period; (2) the course of treatment was for the same conditions or complaints underlying the plaintiff's medical malpractice claim; and (3) the treatment is continuous" (Weinstein v. Gerwitz, 208 AD3d 717, 718-19 [2d Dept 2022] [internal quotation marks and citations omitted].) Here, it is undisputed that the patient received continuous treatment from Dr. Chiu for the chronic ulcer on his right leg between September 17, 2014, and March 19, 2015. During this time, Dr. Chiu conducted an MRI, performed an incision, drainage, sharp excisional debridement, and washout of the patient's right leg. Dr. Chiu also discussed with the patient the possibility of surgery, prescribed a treatment plan including antibiotics, and conducted a pathology report for the same persisting ulcer.
Based on the last date of continuous treatment, the statute of limitations for Plaintiffs' claims expired on September 18, 2017. Thus, Dr. Chiu satisfied his prima facie burden on summary judgment of establishing that Plaintiffs commenced this action after the expiration of the applicable limitations period.
Additionally, the defendant notes that Lavern's Law did not take effect until January 31, 2018. The Legislature provided a "retroactivity provision" in which Lavern's Law would apply to acts, omissions or failures occurring within two years and six months prior to the amendment's effective date of January 31, 2018 (L 2018, ch 1, § 6). In other words, Lavern's Law applies to causes of action accruing on or after July 31, 2015. As the instant cause of action accrued on March 19, 2015, the retroactivity provision is not applicable.
Consequently, the burden shifted to the plaintiffs to present evidence that an exception to the limitations period is applicable. In opposition, Plaintiffs invoke Lavern's Law and its "revival provision" as an applicable exception to the limitations period for cases involving failure to diagnose cancer.
The purpose of the Lavern's Law amendment was to protect patients' rights by ameliorating the statute of limitations in medical malpractice actions concerning the failure to diagnose cancer, ensuring individuals harmed by delayed cancer diagnoses have an opportunity to seek justice. Although the act became effective on January 31, 2018, and applied retroactively to "acts, omissions, or failures" occurring on or after July 31, 2015, it also included a temporary window during which a plaintiff could "revive" claims based on failure to diagnose cancer which became time-barred in the ten months prior to the act.
This "revival provision" provided that "with regard to any action or claim arising from alleged medical malpractice based upon an alleged negligent failure to diagnose cancer or a malignant tumor, whether by act or omission, which within ten months prior to the effective date of the act that created this section, became time-barred under any applicable limitations period then in effect, such action or claim may be commenced within six months of the effective date of the act that created this section, and not beyond" (L 2018, ch 1, § 4 [emphasis added]; see Mula v [*5]Sasson, 181 AD3d 686, 687-688 [2d Dept 2020]).
In other words, given that the effective date was January 31, 2018, this provision allowed a cause of action based on a failure to diagnose cancer, which became time-barred between March 31, 2017 and January 31, 2018, to be commenced within the six-month period ending on July 31, 2018. This revival provision created a temporary window to revive otherwise time-barred claims, distinct from the act's "retroactive applicability" dates.
It is not disputed by the defendant that based on the last date of continuous treatment on March 19, 2015, Plaintiffs' claims became time-barred on September 18, 2017. The revival provision of Lavern's Law is therefore applicable to this action. The claims are based upon a failure to diagnose cancer, and they became time-barred within the ten-month period prior to the effective date of Lavern's Law. Accordingly, the continuous treatment doctrine, when combined with the "revival provision," makes this action timely.
Furthermore, the defendant's argument that Plaintiffs "knew or reasonably should have known" of the alleged injury on October 29, 2014 does not affect the applicability of Lavern's Law and its revival provision. Defendant notes that Plaintiffs received a pathology report on October 29, 2014, which stated that "a well differentiated squamous cell carcinoma including a Keratoacanthoma cannot be completely excluded." They argue that this demonstrates Plaintiffs knew or reasonably should have known of the alleged negligent omission and resulting injury on that date.
Even assuming that the statute of limitations began to run on October 29, 2014 when Plaintiffs received the pathology report, the two-year-and-six-month limitations period would have expired on April 28, 2017. Applying the revival provision, a cause of action based on a failure to diagnose cancer which became time-barred between March 31, 2017 and January 31, 2018, may be revived if it is commenced no later than July 31, 2018.
The instant action was commenced on May 3, 2018, within the six-month "revival provision" window of Lavern's Law which ended on July 31, 2018. For the reasons explained above, this revival period for claims which became time-barred between March 31, 2017 — January 31, 2018 applies to both dates on which the defendant argues Plaintiffs' claims against Dr. Chiu became time-barred, using either the "known or should have known" argument (April 28, 2017) or continuous treatment doctrine (September 18, 2017). Accordingly, the part of Dr. Chiu's motion to dismiss the claims against him as time-barred by the statute of limitations is denied. Both the continuous treatment doctrine and the discovery rule, in conjunction with the Lavern's Law revival provision, render this action timely.
B. Departure and Proximate Causation
As to the substance of the action, Defendant Dr. Chiu moves for summary judgment on the basis that he did not depart from the standard of care and could not have proximately caused the patient's injury. In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department: "[A] defendant must make a prima facie showing either that there was no departure from good and accepted medical practice, or that the plaintiff was not injured by any such departure. Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (Rosenzweig v Hadpawat, 229 AD3d 650, 652 [2d Dept 2024] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v. Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023]).
In support of the motion, Dr. Chiu submits an expert affirmation from Jeffrey Ascherman, M.D. ("Dr. Ascherman"), a licensed physician board certified in plastic surgery. Dr. Ascherman is currently an attending physician and Site Chief of the Division of Plastic Surgery at Columbia University Medical Center and an Associate Professor of Surgery at Columbia. He has [*6]approximately twenty-nine (29) years of experience in the field of plastic/reconstructive surgery. As relevant to this case, he sets forth that he is familiar with the standard of care for Dr. Chiu's treatment of the patient as a plastic and reconstructive surgeon.
Dr. Ascherman opines that Dr. Chiu did not depart from the standard of care in his treatment of the patient. Dr. Ascherman also opines that Dr. Chiu appropriately reviewed and appreciated the findings from the pathology report and conveyed the findings to the patient. He opines, based on the medical records, that Dr. Chiu promptly and properly provided the patient with access to the pathology report via MyChart, and Plaintiffs did access that report on October 29 and November 5. Dr. Ascherman further opines, based on the medical records, that the pathology report did not definitively indicate squamous cell carcinoma, only that it could not be "completely excluded." Therefore, he opines that immediate re-excision was not required and not indicated, given the severe risks involved, including significant neurovascular compromise, infection, and poor healing.
Dr. Ascherman further opines that Dr. Chiu's plan for close clinical follow-up, rather than immediate surgical intervention, was appropriate given the patient's linear scleroderma condition and the wound's apparent improvement at the time. Based on the medical records, Dr. Ascherman opines that Dr. Chiu provided close follow-up of the patient after the October 20, 2014, incision and drainage. He opines that Dr. Chiu's plan to monitor the patient's wound for proper healing and consider resection if improvement did not occur was appropriate, especially given the patient's history of unsuccessful skin grafts and vascularly compromised limb, which made extensive excision down to the bone unduly risky.
Additionally, Dr. Ascherman opines that the patient's "clinical picture changed" when he was next seen by Dr. Chiu on November 26, 2014, having developed a new abscess following his incision and drainage procedure. The expert opines that Dr. Chiu appropriately recommended further excision of the lesion and discussed surgical options at this appointment, on December 17, and on March 19, but the patient declined to pursue surgery.
He further opines that since the focus was on healing the patient's wound, close clinical care did not require any additional MRIs, CT scans, or biopsies. Dr. Ascherman further opines that an oncologist referral was not mandated since there was no definite evidence of cancer while Dr. Chiu treated the patient. He opines that the patient did not require hospitalization at this time, as outpatient monitoring was sufficient. He further opines that Dr. Chiu appropriately referred the patient to a Mohs surgeon/dermatologist, who would address potential cancer concerns, shortly after the pathology results (Exhibit M at 97-98).
Turning to the issue of proximate causation, Dr. Ascherman attributes the patient's below-the-knee amputation of his right leg to his underlying linear scleroderma and the natural course of the disease. He opines that patients who receive appropriate care for squamous cell carcinoma or linear scleroderma sometimes experience the need for limb amputation, even when negligence is not claimed.
The movants also submit an expert affirmation from Aaron Sasson, M.D. ("Dr. Sasson"), a licensed physician board certified in general surgery. Dr. Sasson is currently the Chief of Surgical Oncology Division and Professor of Surgery at Stony Brook Medicine. Dr. Sasson is also currently the Director of the Cancer Center Clinical Operations, Director of the Pancreatic Cancer Center, and Co-Director of the Gastrointestinal Oncology Team.
As a surgical oncologist, Dr. Sasson further opines on the issue of proximate causation. He states that any alleged delay in the patient's treatment had no impact on the outcome of this case, and that the defendants' alleged departures from the standard of care did not proximately cause the patient's amputation. He opines that even if Dr. Chiu had acted on the possibility of squamous cell carcinoma in October 2014, it would not have been feasible to adequately address the potential malignancy in the patient's right leg. Dr. Sasson opines that to remove the entirety of the patient's potential malignancy, Dr. Chiu would have had to excise tissue down to the bone and skeletonize the area to remove all the possible tissue involved in the amount of dissection needed to fully eliminate the patient's compromised tissues in the lower right leg.
Dr. Sasson further opines that amputation was inevitable, regardless of when it occurred, because of the patient's cellulitis, a leg abscess, thickened scar tissue, multiple ulcers, redness, warmth, and drainage on his right leg that was widespread and involved deep tissue. He opines that at this point, the patient's pathology was widespread and involved deep tissue, such that it was unlikely that all the involved tissue could have been removed. He further opines that if all the necessary tissue was removed, the patient's right leg would likely not be functional.
He also opines that even if surgery following the October 2014 incision and drainage was performed and could have obtained clear margins, cancer was likely to recur given the state of the patient's leg. Dr. Sasson therefore opines that an earlier diagnosis and treatment of the cancer in 2014 would have still led to amputation because the patient's claimed injuries, including loss of function in the leg, were unavoidable.
Additionally, Dr. Sasson opines that the 2016 amputation was an elective decision made by the patient due to his long-term scleroderma condition, not one recommended by his treating physicians based on oncology, and notes that he also elected to amputate his right leg due to scleroderma in 2020.
Dr. Sasson further opines that the patient's linear scleroderma "acted as a mechanism for chronic inflammation," resulting in an increased risk of cancer which manifested not only in his leg but other parts of the body. He notes that the squamous cell carcinoma in his right leg was well-differentiated and therefore a "slow growing cancer" with "less potential for metastasis." For this reason, he opines it is unlikely that the cancer from his leg spread to his chest, hand, neck, and thumb. Rather, he opines these were additional manifestations of his underlying pathology and chronic inflammation, unrelated to any treatment he received from Dr. Chiu.
Based on these submissions, the movants have established prima facie entitlement to summary judgment on behalf of Dr. Chiu. They have proffered expert opinions that Dr. Chiu's treatment plan was appropriate and within the standard of care to monitor the wound, not immediately re-excise it, and not refer the patient for oncology while under his care.
The movants have established prima facie that no departure from the standard of care was a proximate cause of the patient's claimed injuries, opining that the patient's amputation was due to the natural course of his linear scleroderma, and not any alleged delay in his treatment. The surgical oncology expert establishes that even an earlier diagnosis of squamous cell carcinoma in October 2014 would not have changed the patient's outcome, because "the patient's pathology (whether malignant or non-malignant abnormal cells) was clearly widespread and involved deep tissue, such that not only it is unlikely that all of the involved tissue could have been removed, but there is little reason to believe that the right leg would have remained functional with the degree of tissue removal necessary." He also opines the cancer was would likely recur due to his chronic wound and infections in the right lower extremity, leading to amputation regardless. Finally, the surgical oncology expert establishes prima facie that the cancer in other parts of his body was not the result of metastasis from his right leg, and therefore not proximately caused by the alleged delay in cancer diagnosis. The burden therefore shifts to the plaintiffs to raise issues of fact.
In opposition, Plaintiffs submits an expert affirmation from a licensed physician [name of expert redacted], certified in general surgery. The Court was presented with a signed, unredacted copy of the affirmation for in camera inspection. To lay the foundation for their opinions, the expert states that they "have evaluated and treated patients who have required surgery for cancers which have developed in chronic wounds," and that they are "fully familiar with the standard of care pertaining to their surgical management and prognosis." No further information was provided to the court as to Plaintiffs' expert's background and experience, particularly in wound care, surgical oncology, or pathology.
Plaintiffs' expert states that the standard of care in the management of any ulcer includes "timely biopsy." The expert further states that when a pathology report yields an "equivocal" finding with "concern for carcinoma," further tissue sampling is required. Plaintiffs' expert opines that atypical squamous proliferation serves as a warning sign for potential squamous cell [*7]carcinoma in unsampled portions of the lesion. This expert further opines that when the term is accompanied by a statement that "squamous cell carcinoma cannot be excluded," it is incumbent upon the treating physician to pursue further diagnostic steps, such as "re-biopsy or complete surgical excision of the lesion for definitive pathological analysis."
Plaintiffs' expert therefore opines that Dr. Chiu deviated from the standard of care by failing to re-biopsy the patient after October 23, 2014. Additionally, this expert opines that Dr. Chiu failed to inform the patient that close clinical follow-up was necessary. The expert states that noting "abscess drainage was discussed" or "wound care continues" in the records does not reflect appropriate oncologic concern or follow-up.
Plaintiffs' expert notes that Dr. Chiu "advised dermatologic follow-up" in an email, but the expert opines that since Dr. Chiu was the surgical lead and had access to the pathology report, the chronicity of the wound, and the clinical presentation of an ulcer with persistent drainage and mass, Dr. Chiu was primarily responsible for addressing the potential malignancy, including further oncological workup. This expert further opines that "a prudent physician would have ensured that a specialist in cutaneous oncology evaluated the lesion promptly—not months later and not left solely to the patient's initiative."
Plaintiffs' expert states, without detail, that he disagrees with the opinion of Dr. Ascherman that the patient's hospitalization was unwarranted after October 2014. The expert opines that given the patient's presentation, Dr. Chiu should have planned for biopsy or further surgical intervention.
On the issue of causation, Plaintiffs' general surgery expert opines that Dr. Chiu's failure to re-biopsy or take other diagnostic steps was a proximate cause of the patient's leg amputation on May 13, 2016. The expert states generally that as squamous cell carcinoma invades adjacent structures like muscle, fascia, and bone, it becomes increasingly difficult to remove while preserving form and function. This expert further opines that at an "advanced stage," amputation becomes the only curable option, and for this reason, the expert attributes the eventual amputation to the delay in diagnosis and incomplete prior surgical interventions.
Plaintiffs' expert opines that early intervention following the October 23, 2014 pathology findings "would have provided a meaningful opportunity to excise the malignant tissue before the cancer invaded deeper structures" and could have prevented the need for amputation. The expert further opines that Dr. Chiu's failure to perform a re-biopsy allowed the lesion to grow unchecked for over a year, ultimately necessitating an amputation. Plaintiffs' expert opines that if intervention had occurred in late 2014 or early 2015, a limited wide local excision with preservation of limb structure would have sufficed, as at that time, the tumor had not reached the dimensions or depth requiring amputation.
Plaintiffs' expert also attempts to counter the opinion of Dr. Sasson that the right leg amputation in 2016 was an elective decision by the patient due to progressive scleroderma rather than untreated cancer, opining that the leg amputation was a "medically necessary oncologic surgery" that could have been avoided had Dr. Chiu acted appropriately in response to the 2014 biopsy. The expert briefly addresses Dr. Sasson's opinion that the squamous cell carcinoma was biologically slow-growing with a low likelihood of metastasis, stating that "squamous cell carcinoma, even when well-differentiated, can behave aggressively," and opining without detail that the failure to excise the lesion caused the cancer to grow and complicate.
Based on evaluation of these submissions, Plaintiffs' expert fails to raise a genuine, triable issue of fact as to whether Dr. Chiu departed from the standard of care in his treatment of the patient. The expert's brief statements as to their qualifications — a board-certified general surgeon who has "evaluated and treated patients who have required surgery for cancers which have developed in chronic wounds" — do not sufficiently lay a foundation to opine on the standard of care for the specific treatment in this case, involving scleroderma and cancer prognosis. Even if the Court accepted the expert as qualified to opine on these issues, their opinions are conclusory, speculative, and unsupported by the record.
Plaintiff's expert opinions on the standard of care lack any specific rebuttal of the details [*8]of the movant's expert, Dr. Ascherman. "In order to not be considered speculative or conclusory, expert opinions in opposition should address specific assertion made by the movant's experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record" (Tsitrin v New York Community Hosp., 154 AD3d 994, 995-996 [2d Dept 2017] [internal quotation marks and citation omitted]).
Plaintiffs' expert states vaguely that "close monitoring" and possible re-biopsy or resection was indicated after the results of the October 2014 incision and drainage. The expert does not address the fact that Dr. Chiu did continue to monitor the wound and recommended re-excision on multiple occasions, but further procedures were declined or postponed by the patient. Dr. Chiu's medical records specify that the patient visited Dr. Chiu for four follow-up appointments after October 23, 2014. During these appointments, Dr. Chiu closely monitored the non-healing wound, recommended an MRI, recommended continuing antibiotics and elevating the lower right extremity while at rest, and repeatedly discussed potential surgical debridement and excision if the wound did not continue to heal. At his final visit in March, Dr. Chiu noted that the patient's lateral wounds had healed. Dr. Chiu also discussed abscess drainage with the patient and ordered continuation of wound care. Plaintiffs' expert fails to articulate the applicable standard of care, only opining in a conclusory and speculative manner that Dr. Chiu did not clinically monitor the patient's condition.
Plaintiffs' expert generally disagrees with Dr. Ascherman that Dr. Chiu's recommendation of a dermatologist in November 2014 was sufficient to address his cancer concerns, because Dr. Chiu was the "surgical lead" with "access to the pathology report." However, the expert fails to address that the dermatologist in question was a Mohs surgeon who would follow up on the pathology result. Plaintiffs' expert fails to articulate the applicable standard of care to "ensure" an oncologic workup was performed, or a timeline for "promptly" addressing potential cancer.
Plaintiffs' expert states that "it is incumbent upon the treating physician to pursue further diagnostic steps" following an inclusive pathology report as seen on October 23, 2014. However, this opinion is conclusory and unsupported by the record, as Dr. Chiu did take further diagnostic steps. At the November 12, 2014, appointment, after a wound culture revealed actinomyces meyeri and streptococcus, Dr. Chiu ordered an MRI to evaluate the underlying bone for infection. Plaintiffs' expert opines that "re-biopsy or complete surgical excision of the lesion for definitive pathologic analysis" was required. The expert does not address the patient's distinct circumstances and is speculative as to what a second biopsy would have revealed. Per Dr. Chiu's medical records, the physician did plan for further surgical intervention, but the patient wanted to delay this until after the holidays (Exhibit "S" at 30, 92). Dr. Chiu also advised the patient to follow up with a dermatologist/Mohs surgeon.
In sum, the Court finds that even if the expert adequately established their foundation for opining on the standard of care, their opinions are conclusory, contradicted by the record, and fail to address the specifics of Dr. Ascherman's affirmation. Thus, they do not raise a genuine issue of fact as to Dr. Chiu's alleged departures from the standard of care.
Moreover, even if Plaintiffs' expert sufficiently raised issues of fact as to the standard of care, the expert has not laid a proper foundation to opine on proximate causation. The court notes that Plaintiffs' expert is a general surgeon who proffers opinions regarding causation in an oncological context. The expert, who set forth only that they "treated patients who have required surgery for cancers which have developed in chronic wounds," has not established any qualifications to opine on what caused the spread of squamous cell carcinoma, nor the causal link to the patient's leg amputation. In contrast, the movant not only provided an expert affirmation from plastic/reconstructive surgeon, but also Dr. Sasson, a specialist in surgical oncology.
"While it is true that a medical expert need not be a specialist in a particular field in order to testify regarding accepted practices in that field . . . the witness nonetheless should be possessed of the requisite skill, training, education, knowledge, or experience from which it can be assumed that the opinion rendered is reliable" (Abruzzi v. Maller, 221 AD3d 753, 756 [2d Dept 2023] [internal quotation marks and citations omitted]; see also de Hernandez v. Lutheran [*9]Med. Ctr., 46 AD3d 517, 518 [2d Dept 2007]).
Here, Plaintiffs' expert has not laid a proper foundation to reliably opine as to causation. Specifically, they cannot counter or refute the opinions of Dr. Sasson that the patient's squamous cell carcinoma was well-differentiated and slow-growing, that any attempt to excise or remove the affected tissue in October 2014 was significantly complicated by his existing scleroderma lesion, and that eventual amputation or loss of leg function was unavoidable.
Further, Plaintiffs' expert does not refute Dr. Sasson's opinion that no act or omission by Dr. Chiu caused the carcinoma to spread to other areas of the patient's body, including his chest, neck, or thumb, which the movant's expert attributed to his chronic scleroderma and inflammation, not a metastatic spread from his leg. Plaintiffs' expert has not set forth their qualifications to reliably opine on these issues or to counter the opinions of the movant's expert that the patient's amputation was not proximately caused by the alleged delay in diagnosis or treatment by Dr. Chiu.
When a defendant moving for summary judgment has met their prima facie burden on the standard of care and proximate causation, Plaintiffs are required to "submit evidentiary facts or materials to rebut the defendant's prima facie showing" as to whether the departure occurred and whether it was a proximate cause of the claimed injuries (Stukas v Streiter, 83 AD3d 18, 30 [2d Dept 2011]). As the Plaintiffs' expert has not met their burden of establishing their qualifications to opine on these issues of proximate causation, and the affirmation is otherwise "conclusory, speculative, or unsupported by the record," failing to address the specific assertions of the movant's experts, it is insufficient to raise a triable issue of fact (see E.G. v. Alzoobaee, 230 NYS3d 738 [2d Dept. 2025]; Barnaman, 213 AD3d at 898-899). Accordingly, the part of the motion seeking summary judgment in favor of Dr. Chiu on the medical malpractice claims is granted.
C. Informed Consent
Defendant Dr. Chiu also moves for summary judgment on Plaintiffs' informed consent claim. To establish a lack of informed consent, the plaintiff must prove three elements: (1) that foreseeable risks, benefits, and alternatives to the treatment were not disclosed to the patient, (2) that a reasonably prudent person in the plaintiff's position would have declined the treatment if they knew of those risks, and (3) that the procedure was a proximate cause of the plaintiff's injuries (see Figueroa-Burgos v. Bieniewicz, 135 AD3d 810, 811-812 [2d Dept 2016]). Therefore, "a defendant can establish entitlement to summary judgment by demonstrating that the plaintiff signed a detailed consent form after being apprised of alternatives and foreseeable risks, by demonstrating that a reasonably prudent person in the plaintiff's position would not have declined to undergo the surgery, or by demonstrating that the actual procedure performed for which there was no informed consent was not a proximate cause of the injury" (Pirri-Logan v Pearl, 192 AD3d 1149 [2d Dept 2021] [internal citations omitted]).
In support of the part of their motion seeking summary judgment on the issue of informed consent, Defendant's plastic surgery expert, Dr. Ascherman opines that Dr. Chiu appropriately discussed risks and obtained written informed consent for the October 20, 2014, incision and drainage procedure, based on the medical record and testimony. He further opines that a reasonably prudent person fully informed of risks, benefits, and alternatives of the October 20, 2014 procedure performed by Dr. Chiu would have consented to the procedure. Dr. Ascherman opines that the claim of lack of informed consent is irrelevant regarding surgical intervention after October 20, 2014, as no further surgery was undertaken or clinically indicated, and the patient declined suggested procedures.
Based on these submissions, Defendant Dr. Chiu has established prima facie entitlement to summary judgment on the issue of informed consent, establishing that the patient was appropriately informed of risks from an invasive procedure.
In opposition, Plaintiffs do not raise any issues of fact as to the informed consent for the October 2014 procedure. However, Plaintiffs' general surgery expert opines that the patient was not adequately informed of the benefits of further excision and could not defer a procedure he [*10]was never adequately informed about. The expert states there is no record that the patient was told that he had a suspicious biopsy that might be cancer, or that failing to re-excise the lesion might lead to limb loss. Plaintiffs' expert opines that it is Dr. Chiu's duty, as the physician, "to document this conversation and obtain truly informed refusal" of potential surgery or treatment.
The crux of the patient's claim against Dr. Chiu is that he failed to timely diagnose and treat his squamous cell carcinoma or refer him for additional testing and treatment. However, lack of informed consent does not apply where the injuries allegedly resulted from a failure to undertake a procedure or a postponing of a procedure (Pinnock v Mercy Med Ctr., 180 AD3d 1088, 1091 [2d Dept 2020]; see also Bueno v. Allam, 170 AD3d 939 [2d Dept 2019]). In this case, on November 26, 2014, Dr. Chiu discussed the possibility of surgical wound debridement with the patient, who then elected to postpone the procedure until after the holidays (Exhibit "S" at 23-24, 92). However, Dr. Chiu did not conduct any procedures after October 2014. There cannot be a lack of informed consent for a procedure or test that never occurred.
Additionally, in a cause of action to recover damages based upon a claim of lack of informed consent, the pleadings must allege that there was some unconsented-to affirmative violation of the plaintiff's physical integrity (Thomas v Farrago, 154 AD3d 896, 897 [2d Dept 2017]; see Public Health Law § 2805—d). Yet, the patient alleges that Dr. Chiu failed to perform any additional testing and treatment procedures, not that Dr. Chiu invaded the patient's bodily integrity without his consent. The only procedure that Dr. Chiu performed was the October 2014 incision and drainage, sharp excisional debridement, and washout of the patient's lower right leg. The operative report from October 20, 2014, noted that Dr. Chiu discussed the surgical risks including bleeding, infection, scarring, and contour deformity, and that, on the same date, the patient provided consent by signing a consent form.
Plaintiffs did not raise any triable issue of fact as to whether informed consent was obtained for the October 20, 2014 procedure, and there was no treatment by Dr. Chiu after that date which is applicable to a lack of informed consent claim. Accordingly, the part of the motion seeking summary judgment in favor of Dr. Chiu on the issue of lack of informed consent is granted.
D. Res Ipsa Loquitur
Next, Defendant Dr. Chiu moves for summary judgment on the issue of res ipsa loquitur, alleging that the doctrine does not apply in this case. Generally, "[t]he doctrine of res ipsa loquitur permits an inference of negligence to be drawn solely from the happening of an accident" (Hafeez v. TT of Freeport, 237 AD3d 1067 [2d Dept 2025], quoting Giantomaso v. T. Weiss Realty Corp., 142 AD3d 950, 952 [2d Dept 2016]). "It requires evidence of an event which ordinarily does not occur in the absence of negligence, was caused by an agency or instrumentality within the exclusive control of the defendant, and was not due to any voluntary action or contribution on the part of the plaintiff" (id.). As the Court of Appeals has stated, res ipsa loquitur is applicable in "a narrow category of factually simple medical malpractice cases" where even laypersons may infer malpractice from the injury, such as when "a surgeon leaves a sponge or foreign object inside the plaintiff's body" (Kambat v. St. Francis Hosp., 89 NY2d 489, 796 [1997]). In less simple cases requiring specialized knowledge, expert testimony can support a finding that the event "would not normally take place in the absence of negligence" (Smith v. Sommer, 189 AD3d 906, 908-909 [2d Dept 2020]; see also States v. Lourdes Hosp., 100 NY2d 208, 214 [2003]).
In support of their argument that the doctrine of res ipsa loquitur is not applicable in this case, Defendant's plastic surgery expert Dr. Ascherman opines that the progression of squamous cell carcinoma occurs in many patients in the absence of any negligence, and even patients who receive appropriate care for squamous cell carcinoma or linear scleroderma may require limb amputation. Thus, this case does not involve the type of event or injury which "ordinarily does not occur in the absence of negligence," and the res ipsa loquitur claim is not applicable. The movant's expert has established that there are many potential causes of the patient's squamous [*11]cell carcinoma, and a limb amputation may ordinarily occur in the absence of negligence.
In their opposition, Plaintiffs do not address the res ipsa loquitur argument or make any showing that it applies to this case. For this reason, the Court finds the doctrine of res ipsa loquitur is not applicable. Accordingly, Dr. Chiu's motion for summary judgment on the issue of res ipsa loquitur is granted.
In sum, Dr. Chiu's motion for summary judgment is granted in its entirety on the theories medical malpractice, lack of informed consent, and res ipsa loquitur, and Plaintiffs' complaint against him is dismissed.
II. Vicarious Liability and Negligent Hiring/Retention/Supervision Against NYU Langone
Plaintiffs' claims against NYU Langone arise from their alleged vicarious liability for Dr. Chiu. Plaintiffs also assert claims of negligent hiring, retention, and supervision against NYU Langone in their Bill of Particulars.
A hospital cannot be held liable for the alleged negligence of a physician not in its employ, and that a hospital is not liable where the patient receives treatment from a private attending physician (see Hill v. St. Clare's Hospital, 67 NY2d 72 [1986]). Additionally, a doctor's affiliation with a hospital, but not employed by the hospital, alone is insufficient to impute the doctor's alleged negligent conduct to the hospital (id.; see also Keitel v. Kurtz, 54 AD3d 387; Ruane v. Niagara Falls Medical Center, 60 NY2d 208 [1983]).
The patient did not seek treatment from NYU Langone, but rather sought treatment directly from Dr. Chiu. As discussed above, Mr. Stupak, the Director of Insurance and Multiline Claims for NYU Langone Health, notes that Dr. Chiu is not currently, nor has he ever been, employed by NYU Langone.
Plaintiffs have not made any allegations of medical malpractice specifically against NYU Langone. The crux of the patient's claims is a purported delay in diagnosing squamous cell carcinoma. Neither NYU Langone nor any of its employees were involved in the treatment or treatment decisions relative to the patient's wounds, and, therefore, had no duty to diagnose any condition. As such, the doctrine of ostensible agency is inapplicable, and NYU Langone cannot be vicariously liable for either physician's alleged medical malpractice.
In their opposition, Plaintiffs do not address or raise any issues of fact as to the employer/employee relationship between NYU Langone and Dr. Chiu.
Accordingly, notwithstanding the Court's finding that Dr. Chiu bears no direct liability, NYU Langone's motion for summary judgment is granted, and all vicarious liability claims against NYU Langone are dismissed.
A. Negligent Hiring
The movants also contend as a matter of law that Plaintiffs cannot maintain a cause of action against NYU Langone for negligent hiring, retention, or supervision, as this is an alternative theory of liability in the absence of a "scope of employment" relationship. "[W]here an employee is acting within the scope of his or her employment, the employer is liable for the employee's negligence under a theory of respondeat superior and no claim may proceed against the employer for negligent hiring, retention, supervision or training" (Quiroz v Zoftola, 96 AD3d 1035, 1037 [2d Dept 2012], quoting Talavera v Arbit, 18 AD3d 738 [2d Dept 2005]).
In support of the part of their motion seeking summary judgment on the issue of negligent hiring, Defendant's plastic surgery expert, Dr. Ascherman opines that all personnel involved in the patient's care were appropriately qualified, skilled, and experienced. He further opines that supervision was ensured by the Defendants when required. Dr. Ascherman opines that the defendants did not fail to properly train, discipline, supervise, promulgate, and enforce appropriate rules applicable to the duties, activities, and practices of its medical personnel. Dr. Ascherman further opines that Defendants did not fail to promulgate, enforce, instruct, advise, abide by, require, or ensure compliance with its own appropriate rules, regulations, guidelines, procedures, by-laws, policies, or protocols with respect to the inquiry, investigation, and certification of credentials, licenses, and malpractice insurance.
The movants also submit an affirmation from Jeffrey Stupak ("Mr. Stupak"), Director of Insurance and Multiline Claims for NYU Langone Health. Mr. Stupak notes that Dr. Chiu is not currently, nor has he ever been, employed by NYU Langone Hospitals (Exhibit "NN" at 1).
Plaintiffs' expert does not raise any issues of fact as to the negligent hiring claims, nor is the issue addressed in their opposing papers. Furthermore, since Dr. Chiu was not employed by NYU Langone Hospitals, there is no employer-employee relationship, and there can be no cause of action for negligent hiring or retention as a matter of law. Accordingly, NYU Langone's motion for summary judgment on the issue of negligent hiring/retention/supervision is granted, and all claims against them are dismissed.
III. Dr. Antonacci
A. Departure and Proximate Causation
In a separate motion for summary judgment (Seq. No. 6), Dr. Antonacci submits an expert affirmation from Garrett T. Desman, M.D. ("Dr. Desman"), a licensed physician board certified in dermatopathology and pathology.
Dr. Desman completed a fellowship in Oncologic Surgical Pathology at Memorial Sloan-Kettering Cancer Center in 2009, and in Dermatopathology at Memorial Sloan-Kettering Cancer Center & New York Presbyterian Hospital-Weill Cornell Medical Center in 2010. He is currently an Assistant Professor of Pathology and Dermatology at Icahn School of Medicine at Mount Sinai. He is also engaged in clinical practice in Dermatopathology at Icahn School of Medicine at Mount Sinai, and as a Dermatopathology Representative of the Skin Cancer Tumor Board at the Tisch Cancer Institute Icahn School of Medicine at Mount Sinai. He has over twenty (20) years of experience in the fields of Pathology and Dermatopathology and Dr. Desman states that he has extensive training and experience in evaluating patients with inflammatory and neoplastic dermatopathologic conditions, including scleroderma and squamous cell carcinoma.
Dr. Desman opines that the care provided by Dr. Antonacci adhered to good and accepted standards of medical practice and that his actions did not constitute a departure from those standards in the treatment of the patient. He notes that the patient's "underlying scleroderma and pansclerotic morphea is both extremely rare and extremely aggressive, difficult to treat, and includes a high risk of developing other comorbidities." Dr. Desman opines that Dr. Antonacci's initial plan on January 7, 2016, which prioritized cleaning the patient's wound and reducing inflammation before a necessary repeat biopsy, was the most appropriate course of action under the circumstances. He further opines that the recommendations for an MRI and Gallium CT scans, made by Dr. Antonacci on January 21, 2016, were appropriate and well-documented. Dr. Desman opines that Dr. Antonacci's decision on February 11, 2016, to recommend a diagnostic debridement and excision with biopsies to evaluate for malignancy after the inflammatory process was under control and imaging did not implicate bony involvement, was appropriate. He opines that, given the diagnostic nature of the initial procedure, Dr. Antonacci's subsequent clinical decision to perform a further debridement and excision to attempt to obtain negative margins was also appropriate. Dr. Desman also opines that, in aiming to remove local disease and save the patient's right leg, a further debridement and therapeutic excision to obtain clean margins was the most appropriate course of action.
Dr. Desman opines that the appropriate first step was to clear the local infection to obtain reliable pathology concerning the wound's potential malignancy, as Dr. Antonacci could not rely on the outdated October 20, 2014, NYU biopsy, which was negative but suspicious for well differentiated squamous cell carcinoma versus keratoacanthoma. Dr. Desman further opines that the standard of care was to obtain an updated biopsy from the current treating facility, which could not be done until the infection was controlled by Dr. Antonacci's aggressive regimen of topical antibiotics. He opines that the initial debridement was appropriate once the infection was controlled.
Dr. Desman further opines that in the two months under Dr. Antonacci's care, the patient was timely evaluated, closely monitored, and an appropriate plan of care was established. He [*12]opines that it was appropriate to first clear the infection locally to attempt to save the patient's leg, Dr. Desman also opines that once cancer was confirmed, local excision was appropriate to try and obtain clear margins. He further opines that a wider excision at the time would have resulted in too much tissue being taken and could have compromised the muscle flap, a future amputation, or the fitting of a prosthetic device.
Dr. Desman further opines that Dr. Antonacci's post-operative care of the patient was appropriate. He opines that although Dr. Antonacci believed they had achieved clean margins based on a gross examination of the wound after the second procedure; this was not the case pathologically. Dr. Desman opines that Dr. Antonacci referring the patient to non-party general surgeon Dr. Robert Andrews for a surgical consult and additional wound management, as well as to oncology and radiation oncology, to explore the feasibility of more extensive resection for clean margins, determining the tumor's depth, and considering amputation options, were the most appropriate course of action following the tangential excision. Upon pathological confirmation of the squamous cell carcinoma deep within the margins, the referrals to various specialists, including a general surgeon, oncologist, and radiation oncologist, was entirely appropriate to explore further treatment options.
Turning to the issue of proximate causation, Dr. Desman opines that the care and treatment rendered by Dr. Antonacci was not a proximate cause of, or a substantial factor in causing, contributing to, or exacerbating the patient's squamous cell carcinoma. Dr. Desman opines that any delay between the patient's initial consultation on January 7, 2016, and the February 2016 procedures was minimal and would not have caused or exacerbated the spread of the patient's cancer. He opines that a three-week delay for a referral to oncology would not have changed the ultimate outcome and was within the standard of care. He further opines that amputation was the most curative option in this circumstance to prevent recurrence, metastasis, and death from disease. Dr. Desman opines that the February 29, 2016, debridement did not contaminate the wound with squamous cell carcinoma and concurs with Dr. Antonacci that there was little concern with spreading cancer around the area due to the low risk of metastasis. Furthermore, Dr. Desman opines that the patient's claims regarding subsequent diagnoses of squamous cell carcinoma to the left upper chest, left thumb, and neck have no merit as it pertains to Dr. Antonacci and notes there is no evidence of complaints or treatment for these areas from Dr. Antonacci between January and March 2016. Dr. Desman opines that these later cancer diagnoses were unrelated and independent from the squamous cell carcinoma in the right lower extremity.
Dr. Antonacci has established prima facie entitlement to summary judgment, based on the expert's opinion that all his treatment from January to March 2016 complied with the standard of care. The movant also established that the patient's amputation was due to the development of his linear scleroderma condition, that the debridement procedures did not contaminate the wound or cause the cancer to spread, and that any alleged delay in treatment was minimal and had no impact on the outcomes of his cancer. These submissions establish prima facie that no alleged departures from the standard of care were the proximate cause of the patient's claimed injuries, and the burden therefore shifts to Plaintiffs to raise issues of fact.
In opposition to Dr. Antonacci's motion for summary judgment, Plaintiffs submit an expert affirmation from the same licensed physician as above [name of expert redacted], certified in general surgery. The Court was presented with a signed, unredacted affirmation for in camera inspection. However, as discussed, no further information was provided to the court as to Plaintiffs' expert's background and experience, particularly in the fields of wound care, surgical oncology, or dermatopathology most relevant to the issues herein.
Plaintiffs' expert opines, generally, that once squamous cell carcinoma is known or suspected, merely performing a debridement, which involves superficial removal of nonviable or infected tissue, is "categorically insufficient and medically contraindicated," as it fails to address the oncologic burden, fails to ensure margin control, and can facilitate wider dissemination of cancer cells. This expert further opines that reconstructive surgery, including skin grafting or flap [*13]coverage, must only be performed after all malignancy has been surgically cleared with verified negative margins. (In this case, no skin grafting or reconstructive surgery was undertaken by the movants.) The expert opines generally that subjecting a known or suspected malignancy to superficial debridement, rather than oncological excision with margin control, can increase the risk of tumor progression and local spread.
Plaintiffs' expert addresses Dr. Desman's opinion that the delay between January 7, 2016, and the February 29, 2016, surgery was minimal and not a departure from the standard of care. Plaintiffs' expert contends that this delay is significant, considering the two-year-old chronic ulcer and a prior October 2014 biopsy which demonstrated squamous cell carcinoma could not be ruled out.
This expert further opines that once the diagnosis of squamous cell carcinoma was confirmed by January 2016, the standard of care required "prompt and aggressive oncologic surgical intervention aimed at obtaining clear margins." The expert opines that the fact an oncologic resection was not undertaken for approximately seven weeks represents a departure from the standard of care.
Plaintiffs' expert states without detail that he disagrees with Dr. Desman's opinion that the clinical decisions made during this period were appropriately tailored to the patient's scleroderma with pansclerotic morphea. This expert opines that while scleroderma poses a challenge to wound healing, it "does not justify delay or indecisiveness in managing a biopsy-proven squamous cell carcinoma." Plaintiffs' expert opines that the defendant departed from the standard of care by pursuing a conservative approach in the face of a confirmed cancer diagnosis, especially when Dr. Antonacci "had access to advanced surgical planning, wound coverage, and multidisciplinary consultations to enable appropriate management."
Plaintiffs' expert notes that the pathology reports following the February 19 and February 29 surgeries confirmed the persistence of squamous cell carcinoma, and the expert opines that "repeat excisions without clear oncologic margins suggest a palliative wound care mindset rather than a proper oncologic approach." Plaintiffs' expert opines that these procedures demonstrated "a deviation from standard surgical oncology protocols."
Furthermore, Plaintiffs' expert addresses Dr. Desman's opinion that there is no credible basis for the claim that the surgery "contaminated" the wound with carcinoma. This expert opines that while the carcinoma was preexisting, incomplete excisional attempts without clear margins "may lead to local dissemination and deeper infiltration." This expert opines that based on "accepted surgical oncology practice," a wide excision and reconstruction "would have prevented progression and amputation."
Plaintiffs' expert attempts to counter Dr. Desman's opinion that the care provided by Dr. Antonacci adhered to the standard of care, stating that "the care plan remained excessively conservative despite confirmed malignancy, consisting of local debridement-type surgeries inappropriate for diagnosed carcinoma." Plaintiffs' expert opines that Defendants failed to take multiple opportunities for appropriate surgical resection with curative intent, not "piecemeal debridement."
As for proximate causation, Plaintiffs' expert states that squamous cell carcinoma has a high risk of aggressive behavior, and a delay in resection allowed for further local progression. This expert briefly addresses Dr. Desman's opinion that the well-differentiated nature of the squamous cell carcinoma implied that any delay was immaterial, opining that even though such tumors may grow more slowly than poorly differentiated tumors, "this does not mean they are clinically indolent, especially in the context of a chronic ulcer in an immunocompromised host." Plaintiffs' expert opines, based on the "documented growth and persistence of the tumor," that any delay allowed for deeper invasion.
In sum, Plaintiffs' expert opines the delay in resection and "inadequate surgical approach" in 2016 proximately caused the cancer to spread and "ultimately necessitated amputation." This expert opines that had Lenox Hill's physicians executed a wide excision upon confirmation of the malignancy in January 2016, the patient's cancer likely could have been controlled without [*14]amputation.
Based on the expert's affirmation, Plaintiffs failed to raise a triable issue of fact as to whether Dr. Antonacci deviated from the standard of care and whether such alleged departures caused the patient's injuries. "While it is true that a medical expert need not be a specialist in a particular field in order to testify regarding accepted practices in that field, the witness nonetheless should be possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the opinion rendered is reliable" (Samer v. Desai, 179 AD3d 860, 862-863 [2d Dept. 2020] [internal citations omitted]). "Thus, where a physician provides an opinion beyond his or her area of specialization, a foundation must be laid tending to support the reliability of the opinion rendered" (i.d. at 863).
As previously discussed, Plaintiffs' expert specializes in general surgery and stated only that they "have evaluated and treated patients who have required surgery for cancers which have developed in chronic wounds." In contrast to the movant's expert, Dr. Desman, Plaintiffs' expert does not lay a proper foundation for his opinions on the standard of care for treating a patient with scleroderma and squamous cell carcinoma and the appropriateness of their treatment of the wound and chronic infection.
Although the expert opines on the standard of care from an "oncologic" standpoint, the expert did not indicate that they had any special training or expertise in oncology, nor dermatology and/or pathology, and failed to set forth how they became familiar with the applicable standards of care in this specialized area of practice (see Deitch v. Sands Point Ctr. for Health & Rehabilitation, 237 AD3d 1043, 1045 [2d Dept. 2025]; see also Samer v. Desai, 179 AD3d at 862-863; Noble v. Kingsbrook Jewish Med. Ctr., 168 AD3d 1077 [2d Dept 2019]; Galluccio v. Grossman, 161 AD3d 1049, 1052 [2d Dept 2018]; Lavi v. NYU Hosps. Ctr., 133 AD3d 830, 831 [2d Dept 2015]). When the expert fails to set forth such a foundation, their opinions lack probative value and cannot raise a triable issue of fact (Galluccio at 1052).
Additionally, an expert's opinion must be predicated on either facts in the record or the witness's personal knowledge; an expert may not assume unsubstantiated facts in reaching his or her conclusions (Erbstein v. Savasatit, 274 AD3d 445, 446 [2d Dept. 2000]). In the affirmation of Plaintiffs' expert, they refer to the squamous cell carcinoma as a "malignancy" numerous times and state that a "conservative approach" was inappropriate, but they do not clarify or elaborate on the details of the patient's medical condition. Specifically, the expert fails to rebut the opinions of the movant's expert, who established his qualifications in oncologic surgical pathology and set forth detailed opinions that the clinical decision to perform debridement and excision procedures in February 2016 to obtain negative margins was appropriate at that stage.
For these reasons, Plaintiffs' expert submissions as to Dr. Antonacci's alleged departures from the standard of care are conclusory, speculative, and fail to rebut the opinions of the movant's expert Dr. Desman.
Plaintiffs also failed to raise any triable issues of fact as to proximate causation, because Plaintiff's expert was not qualified to comment on what caused the squamous cell carcinoma and the patient's leg amputation. Plaintiffs' sole expert is board certified in general surgery, not oncology, pathology, or dermatopathology. Again, the expert has not demonstrated that they possess the required skills, training, education, knowledge, or experience to ensure their opinion is reliable. (Abruzzi at 756; Hernandez at 518), Plaintiffs' expert, fails to articulate his qualifications to provide a credible opinion on the proximate cause of the patient's scleroderma condition and oncological sequalae. As such, the Plaintiffs' expert's affirmation is "conclusory, speculative, or unsupported by the record" and is insufficient to raise a triable issue of fact (Barnaman at 898-899).
Thus, as to the alleged departures from the standard of care and proximate causation, Plaintiffs have not submitted an expert affirmation from a physician qualified to render reliable opinions on the relevant issues, and they have failed to raise a genuine issue of fact by addressing specific assertions made by the movant's expert (see E.G. v. Alzoobaee, 230 NYS3d 738 [2d Dept. 2025]). Accordingly, the part of the motion seeking summary judgment in favor of Dr. [*15]Antonacci on the medical malpractice claims is granted.
B. Informed Consent
Defendant Dr. Antonacci also moves for summary judgment on the basis that he obtained the patient's informed consent. To establish a lack of informed consent, the plaintiff must prove three elements: (1) that foreseeable risks, benefits, and alternatives to the treatment were not disclosed to the patient, (2) that a reasonably prudent person in the plaintiff's position would have declined the treatment if they knew of those risks, and (3) that the procedure was a proximate cause of the plaintiff's injuries (see Figueroa-Burgos, 135 AD3d at 811-812). Therefore, a defendant that can prove that the plaintiff signed a detailed consent form after discussing alternative and foreseeable risks, that a reasonable person in this circumstance would have undergone the procedure, or that the actual procedure performed was not the proximate cause of the injury (Pirri-Logan, 192 AD3d at 1149).
In support of the part of their motion seeking summary judgment on the issue of informed consent, Defendant's expert Dr. Desman opines, based on the operative notes from both procedures, that the risks, benefits, and alternatives of the debridement of the right leg and homograft placement were appropriately discussed with the patient, and that the patient gave informed consent to the procedure on both dates. Dr. Desman further opines, based on the operative notes, that the patient signed detailed informed consent forms prior to each procedure. (See Exhibit "P" at 39, 42, 102, 105.)
According to the operative reports, Dr. Suplee, not Dr. Antonacci, fully explained the nature of the debridement procedure, including its risks, benefits, and alternatives, to the patient before both debridement procedures. However, the Second Department has held that a plaintiff cannot sustain an informed consent claim where the patient was apprised of the risks, even by other physicians, and chose to undergo treatment (see Spano v Bertocci (299 AD2d 335 [2d Dept 2002]). As the non-disclosure of foreseeable risks and alternatives is an essential element of the claim, this showing is sufficient on its own to demonstrate entitlement to summary judgment.
Furthermore, the expert establishes prima facie that any alleged unconsented-to procedure was not the proximate cause of Plaintiffs' claimed injuries. Dr. Desman opines that February 2016 debridement procedures "did not cause the wound to become contaminated" or cause any spread of cancer to the surrounding area, as the squamous cell carcinoma was "well differentiated and consistent with slow growth" and "not a significant risk of metastasis."
Based on the expert affirmation and medical records, Dr. Antonacci has established that the alternatives and foreseeable risks were disclosed to the patient prior to signing the consent forms for the debridement procedures at Lenox Hill on February 19, 2016, and February 29, 2016 (see Pirri-Logan v Pearl, 192 AD3d 1149; Johnson v Staten Island Medical Group, 82 AD3d 708 [2d Dept 2011]). He further established that the debridement procedures did not proximately cause injury to the patient, which is a required showing for a lack of informed consent claim (see Walker v. St. Vincent Catholic Med. Centers, 114 AD3d 669 [2d Dept 2014]).
In opposition, Plaintiffs' expert does not address or offer any opinions as to informed consent claims against Dr. Antonacci. Plaintiffs have raised no triable issues of fact as to whether the patient was adequately informed of the risks and alternatives to the February 2016 debridement procedures. Plaintiffs also have not raised a triable issue of fact that the procedures proximately caused the patient's injuries. Accordingly, the part of the motion seeking summary judgment in favor of Dr. Antonacci on the issue of lack of informed consent is granted.
C. Res Ipsa Loquitur
Turning to Plaintiffs' claims of res ipsa loquitur, as discussed in reference to Dr. Chiu, this cause of action as to Dr. Antonacci is also not applicable. The res ipsa loquitur doctrine allows an inference of negligence solely from the occurrence of an accident; it requires evidence of an event that would not normally occur without negligence, caused by an instrumentality entirely controlled by the defendant, and was not due to any action on the plaintiff's part. (Hafeez v. TT of Freeport, 237 AD3d 1067 [2d Dept 2025], quoting Giantomaso v. T. Weiss Realty [*16]Corp., 142 AD3d 950, 952 [2d Dept 2016]).
The movants have established that the patient's squamous cell carcinoma and leg amputation are not the type of event or injury which would not normally occur without negligence. In their opposition, Plaintiffs do not address the res ipsa loquitur argument or make any showing that it applies to this case.
Accordingly, Dr. Antonacci's motion for summary judgment on the issue of res ipsa loquitur is granted. All Plaintiffs' claims against Dr. Antonacci are therefore dismissed.
IV. Dr. Suplee
A. Departure and Proximate Causation
In the same motion for summary judgment (Seq No. 6), Dr. Suplee incorporates the arguments, statement of facts, and expert testimony from Dr. Antonacci's motion for summary judgment, discussed above.
In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process. As previously summarized, a defendant must show prima facie that there was either no departure from good and accepted medical practice, or that the plaintiff was not injured by such malpractice. Once a defendant makes this showing, the burden shifts to the plaintiff to prove a triable issue of fact as to the elements shown by the defendant. Summary judgment is not appropriate in a medical malpractice action when the parties present conflicting medical expert opinions. (Rosenzweig, 229 AD3d at 652 [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman, 213 AD3d at 898-899).
Dr. Suplee was the vascular surgeon who was consulted by Dr. Antonacci and assisted in the clinical decision-making for the patient's care and treatment. He participated in the planned careful extensive tangential excision of the wound. Specifically, Dr. Suplee performed two debridement procedures on the patient's right lower leg wound: one on February 19, 2016, and another on February 29, 2016, with Dr. Antonacci present. Dr. Suplee also provided post-operative care and follow-up for the patient, which included an antibiotic dressing change and a culture of the right lower leg wound. Dr. Suplee participated in the discussion of the final pathology from the second procedure, which showed well-differentiated squamous cell carcinoma with positive deep margins.
In support of Dr. Suplee's motion for summary judgment, Defendants rely on the previously submitted expert affirmation from Dr. Desman. As discussed above, Dr. Desman's submitted opinions regarding both the alleged departures from the standard of care and proximate causation apply to Dr. Suplee, as he was involved in the same treatment plan and debridement procedures in 2016. Based on these submissions, Defendant Dr. Suplee has established prima facie entitlement to summary judgment as to the alleged deviation from the standard of care and as to proximate causation.
In opposition, Plaintiffs refer to the previously submitted expert affirmation from a general surgeon. As previously addressed, this expert's opinions on both the alleged departure from the standard of care and proximate causation also apply to Dr. Suplee.
For the same reasons set forth in Dr. Antonacci's motion for summary judgment, this Court finds that Plaintiffs failed to raise any triable issues of fact as to whether Dr. Suplee departed from the standard of care and whether such alleged departures proximately caused the patient's injuries. Plaintiffs' expert did not establish sufficient qualifications to opine on whether the Lenox Hill physicians complied with the applicable standard of care, and they failed to rebut the specific assertions made by the movant's expert on the appropriate course of treatment from a surgical oncology standpoint. Additionally, Plaintiffs' expert was not qualified to render opinions on whether the alleged delay in treatment or the performance of debridement procedures worsened the patient's outcome or proximately caused his need for amputation.
Accordingly, the part of the motion seeking summary judgment in favor of Dr. Suplee on [*17]the medical malpractice claims is granted.
B. Informed Consent
Defendant Dr. Suplee also moves for summary judgment on the basis that he obtained the patient's informed consent. For the same reasons as discussed in Dr. Antonacci's motion for summary judgment, this Court finds that Dr. Suplee fully explained the nature of the debridement procedure, including its risks, benefits, and alternatives to the patient before both procedures. This Court also finds, as discussed above, that Plaintiffs failed to raise a triable issue of fact as to proximate causation, which is a required demonstration for a lack of informed consent claim (see Walker v. St. Vincent Catholic Med. Centers, 114 AD3d 669 [2d Dept 2014],) Accordingly, the part of the motion seeking summary judgment in favor of Dr. Suplee on the issue of lack of informed consent is granted.
C. Res Ipsa Loquitur
Turning to Plaintiffs' claims of res ipsa loquitur, as previously discussed, this cause of action as to Dr. Suplee is also not applicable. Plaintiffs do not address the res ipsa loquitur argument or make any showing that it applies to this case. Accordingly, Dr. Suplee's motion for summary judgment on the issue of res ipsa loquitur is granted. All claims against Dr. Suplee are dismissed.
V. Vicarious Liability and Negligent Hiring Claims Against Lenox Hill
Plaintiffs' claims against Lenox Hill arise from their vicarious liability for Dr. Antonacci and Dr. Suplee. It is undisputed by the parties that Dr. Antonacci and Dr. Suplee were employees of Lenox Hill, and that Lenox Hill is vicariously liable for their acts and omissions under the respondeat superior doctrine. However, "[a] claim of vicarious liability cannot stand when there is no primary liability upon which such a claim of vicarious liability might rest" (Longhi v Lewit, 187 AD3d 873, 878 [2d Dept 2020] [internal quotation marks and citations omitted]). Therefore, as a matter of law, summary judgment is granted to Lenox Hill on the issue of vicarious liability, because all underlying malpractice and lack of informed consent claims against Dr. Antonacci and Dr. Suplee have been dismissed.
A. Negligent Hiring
The only direct claims against Lenox Hill in Plaintiffs' bill of particulars are on the basis of negligent hiring, retention, training, and/or supervision. These claims are also dismissed as a matter of law, as this is an alternative theory of liability in the absence of a "scope of employment" relationship. "[W]here an employer is liable for the employee's negligence under the theory of respondeat superior, the plaintiff may not proceed with a cause of action to recover damages for negligent hiring and retention" (Tabchouri v Hard Eight Restaurant Company, LLC, 219 AD3d 528, 533 [2d Dept 2023], quoting Ashley v City of New York, 7 AD3d 742 [2d Dept 2004]). It is undisputed by the parties that Dr. Antonacci and Dr. Suplee were employed by Lenox Hill at the time of the alleged medical malpractice, and that that they are vicariously liable to the extent their physicians and staff are found liable for malpractice. As such, the claim for negligent hiring, retention, training, and supervision is inapplicable to the facts in the record.
Plaintiffs do not raise any issues of fact as to negligent hiring, training, and supervision, and these issues are not addressed in their opposition papers. Therefore, Lenox Hill's motion for summary judgment on the vicarious liability and negligent hiring/retention/training/supervision claims is granted, and all claims against Lenox Hill re dismissed.
VI. Loss of Consortium.
Finally, as the patient's underlying causes of action sounding in medical malpractice against the moving defendants are dismissed, the derivative claims of the co-plaintiff for loss of companionship, society, and consortium cannot survive independently and are also dismissed (see Klein v Metropolitan Child Services, Inc., 100 AD3d 708, 711 [2d Dept 2012]).
It is hereby:
ORDERED that Dr. Clark's motion (Seq. No. 4) seeking summary judgment in her favor is GRANTED without opposition in its entirety; and it is further
ORDERED that the part of the motion (Seq. No. 5) seeking to dismiss the claims against Dr. Louie, is GRANTED without opposition in its entirety; and it is further
ORDERED that the part of the motion (Seq. No. 5) seeking to dismiss otherwise viable claims in this action as time-barred is DENIED; and it is further
ORDERED that the part of the motion (Seq. No. 5) seeking summary judgment in favor of Dr. Chiu is GRANTED in its entirety; and it is further
ORDERED that the part of the motion (Seq. No. 5) seeking summary judgment in favor of NYU Langone for vicarious liability and negligent hiring/retention/supervision is GRANTED in its entirety; and it is further
ORDERED that the part of the motion (Seq. No. 6) seeking summary judgment in favor of Dr. Antonacci is GRANTED in its entirety; and it is further
ORDERED that the part of the motion (Seq. No. 6) seeking summary judgment in favor of Dr. Suplee is GRANTED in its entirety; and it is further
ORDERED that the part of the motion (Seq. No. 6) seeking summary judgment in favor of Lenox Hill for vicarious liability and negligent hiring/retention/supervision is GRANTED; and it is further
ORDERED that this action is dismissed in its entirety.
The Clerk shall enter judgment in favor of ERNEST S. CHIU, M.D., EDDIE LOUIE, M.D., NYU LANGONE MEDICAL CENTER, LILY CLARK, M.D., ANTHONY ANTONACCI, M.D., RYAN SUPLEE, M.D., and LENOX HILL HOSPITAL.
This constitutes the decision and order of this Court.
Hon. Consuelo Mallafre Melendez
J.S.C.

Footnotes

Footnote 1: Morphea, also known as localized scleroderma, is a rare inflammatory skin and subcutaneous tissue condition characterized by excessive collagen deposition that causes patches of hardened and discolored skin.

Footnote 2: Gallium activity refers to the distribution and concentration of the radioactive isotope gallium-67 ("Ga-67"), a photon-emitting radiotracer used in scintigraphy, a nuclear medicine imaging technique for diagnosing and localizing infections, inflammations, and certain types of cancers.